IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| ABODE HEALTHCARE INC., <br><br> Plaintiff, <br><br> v. <br><br> RICK W. BREUSS III and SACRED ENCOUNTER HOSPICE CENTRAL IOWA, LLC, <br><br> Defendants. | **No. 4:26-cv-00218-RGE-WPK** <br><br><br> **ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |

## I.    INTRODUCTION

Plaintiff Abode Healthcare Inc. sues Defendants Rick W. Breuss III and Sacred Encounter Hospice Central Iowa, LLC for alleged breach of contract, tortious interference with contract, tortious interference with current and prospective economic relations, and civil conspiracy. Abode seeks declaratory judgment to enforce the restrictive covenant of the contract. Now before the Court is Abode's motion for a preliminary injunction against Breuss and Sacred Encounter. For the reasons set forth below, the Court denies Abode's motion.

## II.    BACKGROUND

The limited purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). "[H]aste . . . is often necessary if those positions are to be preserved." *Id.* As a result, the Court's decision to grant or deny an injunction rests on "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Id.* Accordingly, the Court's findings of fact and conclusions of law in this Order are not binding at trial. *See id.*

On May 19, 2026, Abode filed a four-count complaint against Defendants in this Court, asserting claims for breach of contract against Breuss (Count I); tortious interference with contract

against Sacred Encounter (Count II); tortious interference with current and prospective economic relations against Breuss and Sacred Encounter (Count III); and civil conspiracy against Breuss and Sacred Encounter (Count IV). Compl. ¶¶ 41–64, ECF No. 1.

On the same day, Abode moved for a preliminary injunction. Pl.'s Mot. Prelim. Inj., ECF No. 2; Pl.'s Br. Supp. Mot. Prelim. Inj., ECF No. 2-1. Abode requests the Court enjoin Breuss "from breaching a covenant not to compete he executed as an executive of Abode," and enjoin Sacred Encounter "from conspiring with Breuss to breach that covenant, from tortiously interfering with Breuss's contract with Abode, and from tortiously interfering with Abode's business relations in the Des Moines area." ECF No. 2 at 1.

Defendants responded, incorporating arguments made in their brief supporting their separate motion to dismiss. Defs.' Resp. Pl.'s Mot. Prelim. Inj., ECF No. 26; Defs.' Br. Supp. Mot. Dismiss, ECF No. 27-1. Abode replied. Pl.'s Reply Supp. Mot. Prelim. Inj., ECF No. 32. The Court admits the exhibits provided by the parties and considers them in weighing Abode's motion. While Abode requests a hearing, the dispositive issue is adequately presented by the parties' filings and the record before the Court, rendering a hearing unnecessary.

For the reasons set forth below, the Court denies Abode's request for a preliminary injunction.

## III.    LEGAL STANDARD

"The party seeking a preliminary injunction bears the burden of establishing the necessity of this equitable remedy." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 316 (8th Cir. 2009). To decide if a movant satisfies this burden, the Court considers the four *Dataphase* factors: "(1) the threat of irreparable harm to the moving party; (2) the weight of this harm as compared to any injury an injunction would inflict on other interested parties; (3) the probability that the moving party will succeed on the merits; and (4) the public interest." *Id.* (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)). The *Dataphase* factors are not applied as

2

a "rigid formula." *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999). "No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987). Ultimately, the Court "has broad discretion when ruling on requests for preliminary injunctions." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998).

## IV.    DISCUSSION

The Court briefly addresses the applicable law. Both the 2021 and 2025 contracts between the parties contain a choice of law provision. Pl.'s Ex. A at 14–15, ECF No. 2-3; Pl.'s Ex. C at 11, ECF No. 2-5. Section 12 of the 2025 contract states: "Applicable Law. This Agreement shall be governed by the laws of the Commonwealth of Kentucky, without giving effect to any choice of law rules that would cause the laws of any jurisdiction other than the Commonwealth of Kentucky to be applied." ECF No. 2-5 at 11. The 2021 contract contains a nearly identical choice of law provision. ECF No. 2-3 at 14–15.

"A federal court sitting in diversity applies state substantive and federal procedural law [and] . . . [b]ecause contract interpretation is substantive," the Court applies state substantive law. *Miller v. Honkamp Krueger Fin. Servs., Inc.*, 9 F.4th 1011, 1016 (8th Cir. 2021). To determine which state's substantive law applies, the Court looks to the choice of law rules of the forum state. *Id.* Under Iowa law, "[w]here an agreement contains a choice-of-law provision, Iowa follows Restatement (Second) of Conflict of Laws section 187." *Hussemann ex rel. Ritter v. Hussemann*, 847 N.W.2d 219, 222 (Iowa 2014). The Iowa Supreme Court has recognized the "Restatement Second, Conflicts of Law[s], s[ection] 187, permits the parties to agree on the law to be applied to the contract in most cases so long as it does not override the public policy of a state having a materially greater interest in the transaction." *Joseph L. Wilmotte & Co. v. Rosenman Bros.*, 258 N.W.2d 317, 328 (Iowa 1977). The Court therefore respects the choice of the parties reflected

3

in the governing law provisions of the contracts and applies Kentucky law. *See id.*

Abode seeks a preliminary injunction to enforce § 9(b) of the 2021 contract, which imposes eighteen-month non-solicitation and non-compete covenants against Breuss. ECF No. 2-3 at 6–9. The Court considers each *Dataphase* factor in turn, applying Kentucky substantive law.

### A.    Likelihood of Success on the Merits

Although "'no single factor is determinative,'" likelihood of success on the merits is "the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113). To determine the likelihood of success on the merits, the Court assesses whether the plaintiff has a "fair chance" of prevailing. *Planned Parenthood v. Rounds*, 530 F.3d 724, 732–33 (8th Cir. 2008) (en banc). In doing so, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo." *United Indus.*, 140 F.3d at 1179 (quoting *Calvin Klein Cosmetics*, 815 F.2d at 503). When a plaintiff asserts multiple claims and seeks preliminary relief, "[t]he plaintiff need only establish a likelihood of succeeding on the merits of any one of [its] claims." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (second alteration in original) (internal quotation marks and citation omitted). The Court focuses on whether Abode is likely to succeed on Count I of its complaint—the breach of contract for failure to comply with the eighteen-month non-solicitation and non-compete covenants. Abode argues the covenants survived the 2025 contract, while Defendants argue the 2025 contract eliminates the 2021 covenants.

Defendants argue "the 2025 Agreement's integration clause in Section 14 unambiguously supersedes the 2021 Agreement, that the expressio unius canon confirms the 2021 Agreement was intentionally excluded from the 'notwithstanding' carve-out, and that the 2025 Agreement's six-month non-competition covenant in Section 9(b)(iii) is the operative restriction." ECF No. 26 at 6. Abode argues Defendants' "contention is contradicted by the plain language of the 2025

4

Agreement," "and based on an analysis of the four corners of the 2025 Agreement, the restrictive covenant contained in the 2021 Agreement 'runs parallel with' the restrictive covenant contained in the 2025 Agreement, and does not replace or nullify it." ECF No. 2-1 at 11–12.

The Court first addresses whether the 2025 contract is ambiguous as to whether the 2021 covenants are preserved, then proceeds to consider if the covenants are enforceable such that Abode is likely to succeed on the merits of its breach of contract claim.

### 1.    Ambiguity of the 2025 Contract

Under Kentucky law, "[t]he construction and interpretation of a contract, including questions regarding ambiguity, are questions of law to be decided by the court." *Thomas v. Univ. Med. Ctr., Inc.*, 620 S.W.3d 576, 591 (Ky. 2020) (alteration in original) (internal quotation marks and citation omitted). "A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations." *Kentucky Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 694–95 (Ky. 2016) (internal quotation marks and citation omitted). An unambiguous written contract "will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (internal quotation marks and citation omitted). As such, a court "look[s] only as far as the four corners of the document to determine the parties' intentions" where a contract is unambiguous. *3D Enters. Contracting Corp. v. Louisville and Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005). Critically, "[t]he fact that one party may have intended different results, however, is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney v. Nationwide Mut. Ins. Co.,* 215 S.W.3d 699, 703 (Ky. 2006) (internal quotation marks and citation omitted).

"If an ambiguity exists, the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation

of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions." *Frear*, 103 S.W.3d at 106 (internal quotation marks and citation omitted).

Section 9(b) of 2021 contract states "[f]rom the Commencement Date until the Date of Termination and for eighteen (18) months thereafter" "Executive will not" compete with or solicit individuals in violation of the covenants. ECF No. 2-3 at 6–9. "Date of Termination" is a defined term in the 2021 contract—Section 11(o) states "'Date of Termination' shall mean the effective date of cessation from employment with the Company and all other Affiliated Companies, for any reason or no reason." *Id.* at 13. The 2025 contract contains its own shorter six-month non-compete agreement in § 9(b)(iii). ECF No. 2-5 at 6.

> The 2025 contract has a general integration clause which states:
>
> Entire Agreement. This Agreement contains the entire agreement with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties, including but not limited to any prior employment agreement. Notwithstanding the foregoing, the restrictive covenants set forth herein are in addition to, and not in substitution or in lieu of, any similar covenants that may be applicable to Executive pursuant to any non-compete, employment, consulting, stock option or any other contract or agreement entered into by Executive prior to, contemporaneously with or after the entry into this Agreement (including, without limitation, that certain Confidentiality, Non-Interference and Invention Assignment Agreement entered into in connection with the issuance of stock options pursuant to the then current Stock Incentive Plan entered into prior to this Agreement which the parties acknowledge and agree remains in full force and effect) each of which shall remain in full force and effect, run parallel with this Agreement and continue in addition to those contained in this Agreement.

*Id.* at 11. Contained within this general integration clause is a specific exclusion for prior restrictive covenants entered into between the parties. *Id.* The integration clause states the covenants provided for in the 2025 contract are "in addition to, and not in substitution or in lieu of, any" previously agreed-to covenants, including a previous "non-compete." *Id.* The clause further emphasizes these previous covenants "shall remain in full force and effect, run parallel with this Agreement and continue in addition to those contained in this Agreement." *Id.* The unambiguous language of

6

the 2025 contract therefore makes clear prior restrictive covenants, including non-compete agreements, are not terminated or altered by the new contract and "run parallel with" any new agreements.

Defendants argue the "Notwithstanding" carve-out provision "names only the Confidentiality, Non-Interference and Invention Assignment Agreement, and the Stock Incentive Plan; it conspicuously omits the 2021 Agreement." ECF No. 26 at 7. From this, Defendants assert "under expressio unius that omission excludes the 2021 Agreement's restrictive covenants." *Id.* The parenthetical in the 2025 contract naming these specific prior agreements, however, states "including, *without limitation*, that certain Confidentiality, Non-Interference and Invention Assignment Agreement entered into . . . remains in full force and effect." ECF No. 2-5 at 11 (emphasis added). The clear and unambiguous language of the parenthetical indicates these agreements are listed as examples of agreements which remain in effect, and are not intended to be an exhaustive list. In addition, "non-compete" is listed as a specific type of restrictive covenant which expressly survives the general integration clause. *Id.*

Because no reasonable person could find the 2025 general integration clause eliminated the 2021 restrictive covenants, the 2025 contract is unambiguous. *Cf. Kentucky Shakespeare Festival, Inc.*, 490 S.W.3d at 694–95. The Court is therefore required to "enforce[] [the 2025 contract] strictly according to its terms . . . and without resort to extrinsic evidence." *Frear,* 103 S.W.3d at 106 (internal quotation marks and citation omitted). While Breuss may have intended for the 2025 contract to nullify the 2021 restrictive covenants, Kentucky law makes clear "[t]he fact that one party may have intended different results [ ] is insufficient to construe a contract at variance with its plain and unambiguous terms." *Abney,* 215 S.W.3d at 703 (internal quotation marks and citation omitted). The 2021 eighteen-month non-solicitation and non-compete covenants against Breuss unambiguously survive the general integration provision of the 2025 contract.

### 2.    Enforceability of the 2021 Covenants

Kentucky law "clearly establishes that covenants not to compete are valid and enforceable." *Kegel v. Tillotson*, 297 S.W.3d 908, 911 (Ky. Ct. App. 2009). Such agreements are upheld "where they are reasonable in scope and in purpose." *Hall v. Willard & Woolsey, P. S. C.*, 471 S.W.2d 316, 317 (Ky. 1971). "Reasonableness is to be determined generally by the nature of the business or profession and employment, and the scope of the restrictions with respect to their character, duration and territorial extent." *Id.* at 317–18 (internal quotation marks and citation omitted). The Court first discusses the nature of the hospice business, then discusses the scope of the restrictions as applied to Breuss.

In support of its motion for preliminary injunction, Abode offers the declaration of Matthew Tierney—Vice President of Human Resources for BrightSpring Health Services, the parent company of Abode. Tierney Decl. ¶ 3, ECF No. 2-2. Tierney states "[t]he competition for hospice patients is intense in the Des Moines area. Having an additional competitor in that market makes it more difficult for Abode to attract new patients" *Id.* ¶ 34. Tierney states additional competitors in the market "makes hiring [ ] candidates more difficult and forces Abode to consider offering salaries that it would not otherwise offer in order to attract qualified candidates. It also makes retaining current personnel more difficult." *Id.* ¶ 32. The evidence therefore demonstrates the hospice business is a competitive one.

The Court next addresses whether the character, duration, and territorial extent of the restrictive covenants are reasonable, beginning with the character of the restraint. The 2021 restrictive covenants prohibit Breuss from soliciting employees and customers, and prohibit him from competing in the territory as defined in § 11(aa) of the 2021 contract. ECF No. 2-3 at 14. The character of the restraint is reasonable in light of the senior position Bruess held and the nature of the business. *See Borg-Warner Protective Servs. Corp. v. Guardsmark, Inc.*, 946 F. Supp. 495,

502 (E.D. Ky. 1996).

The Court next addresses the duration of the restraint. The 2021 restrictions apply for a period of eighteen months. Kentucky courts have generally recognized an eighteen-month period as reasonable. *See, e.g.*, *Louisville Cycle & Supply Co. v. Baach*, 535 S.W.2d 230, 234 (Ky. 1976) (enforcing a non-compete with an eighteen-month duration); *Cent. Adjustment Bureau, Inc. v. Ingram Assocs., Inc.*, 622 S.W.2d 681, 686 (Ky. Ct. App. 1981) (enforcing a two-year non-compete). The duration of the restraint is reasonable. *Cf. Id.*

> The Court lastly addresses the territorial restraint. "Territory" is defined as:

> (i) the counties in which are located the operations for which Executive works or has worked or is responsible or has been responsible and all counties contiguous to such counties, (ii) the states, commonwealths or provinces in which are located the operations for which Executive works or has worked or is responsible or has been responsible and all states, commonwealths and provinces contiguous to such states, commonwealths or provinces and (iii) the United States of America or any other jurisdiction in which the Company or any other Affiliated Company conducts business.

ECF No. 2-3 at 14. While this term leaves room for ambiguity regarding whether the scope of the restraint is limited to the counties and states Breuss worked in, or seeks to claim the entirety of the United States as the covered area, Abode justifies application of the covenants only in the "territory of Iowa, Ohio, Wisconsin and Indiana." ECF No. 2-1 at 10. These states represent the states Breuss was responsible for during his employment with Abode, as Breuss confirms in his declaration. Breuss Decl. ¶ 12, ECF No. 26-3. Tierney explains, "Breuss was responsible for the development and operation of Abode facilities in Iowa, Ohio, Wisconsin and Indiana, including business development planning and the hiring of personnel." Tierny Decl. ¶ 21, ECF No. 2-2. Tierney further asserts "Breuss continued to have access to Abode Confidential Information for those states." *Id.* ¶ 22.

Moreover, to the extent that subsection (iii) of the "Territory" definition is overly broad, Kentucky law provides a "blue pencil" rule, which "empower[s] [courts] to reform or amend

9

restrictions in a non-compete clause if the initial restrictions are overly broad or burdensome." *Kegel*, 297 S.W.3d at 913. In such cases, a court may "restrict[] [the restraint] to its proper sphere and enforce[e] it only to that extent." *Id.* Therefore, the Court restricts the territorial scope of the covenants to the states Breuss was responsible for—Iowa, Ohio, Wisconsin, and Indiana. Such a territorial definition aligns with subsection (i) and (ii) of the contract definition and Abode's briefing as to the territory in which it seeks to enforce the covenants.

Because Iowa, Ohio, Wisconsin, and Indiana represent the territory Breuss was responsible for, the territorial scope of the restraint is reasonable. *See Hammons v. Big Sandy Claims Serv., Inc.*, 567 S.W.2d 313, 315 (Ky. Ct. App. 1978).

The 2021 covenants are reasonable under Kentucky law and therefore may be properly enforced against Breuss. *Cf. Kegel*, 297 S.W.3d at 913.

### 3.    Evidence of Violation of the 2021 Covenants

The Court concludes by briefly addressing whether Abode has shown a high likelihood of success in proving Defendants have, and may continue to, violate the 2021 restrictive covenants. *Cf. Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 858–59 (S.D. Iowa 2013). Abode has shown a likelihood of success in showing the 2021 covenants survive the 2025 contract, and the 2021 covenants are enforceable under Kentucky law. Abode must also show Defendants have and may continue to violate the 2021 covenants. This is necessary to show a likelihood of success as to their breach of contract against Breuss, tortious interference with contract against Sacred Encounter, tortious interference with current and prospective economic relations against Breuss and Sacred Encounter, and civil conspiracy against Breuss and Sacred Encounter because all claims are premised upon violation of the 2021 covenants. ECF No. 1 ¶¶ 41–64.

Breuss's last day of employment with Abode was August 19, 2025. Breuss Decl. ¶ 20, ECF No. 26-3. Breuss was required to abstain from soliciting employees and customers, or competing in the territory of Iowa, Ohio, Wisconsin, and Indiana for a period of eighteen months. Breuss

would therefore be in violation of the covenants if he takes any prohibited actions before February 19, 2027.

Breuss formed Sacred Encounter on February 12, 2026. Pl.'s Ex. D at 2, ECF No. 2-6; Breuss Decl. ¶ 22, ECF No. 26-3. The purpose of Sacred Encounter is to operate a hospice business in the Des Moines area. Breuss Decl. ¶ 25, ECF No. 26-3. Sacred Encounter is seeking to employ individuals for the same roles as Abode offers. Tierney Decl. ¶¶ 29–30, ECF No. 2-2. Sacred Encounter has also hired an employee who previously worked at Abode. *Id.* ¶ 33. Abode has therefore demonstrated a likelihood of success in showing Breuss breached his duty to abstain from soliciting employees and customers or competing in the territory of Iowa prior to February 19, 2027.

As such, Abode's evidence indicates a high likelihood of success in proving Defendants have, and may continue to, violate the 2021 covenants. *Cf. Reg Seneca, LLC*, 938 F. Supp. 2d at 858–59.

### B.    Irreparable Harm

The Court turns next to the threat of irreparable harm. The Court looks to Kentucky law for the proper standard for irreparable harm. *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 935 (8th Cir. 2002) (applying state substantive law to the irreparable harm prong of the *Dataphase* factors). Under Kentucky law, "a temporary injunction may be granted during the pendency of an action if it is clearly shown that the [plaintiff's] rights are being, or will be, violated and the [plaintiff] will suffer immediate and irreparable harm." *Norsworthy v. Kentucky Bd. of Med. Licensure*, 330 S.W.3d 58, 61–62 (Ky. 2009). "In order to obtain a preliminary injunction, the harm that would result in the absence of the injunction must be irreparable, not merely substantial." *Id.* at 62. "Further, 'mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.'" *Id.* (quoting *Sampson v. Murray*, 415 U.S. at 61, 90 (1974) ("The possibility that adequate compensatory or other corrective relief

11

will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.")).

An injury is irreparable if "there exists no certain pecuniary standard for the measurement of the damages." *Cyprus Mountain Coal Corp. v. Brewer*, 828 S.W.2d 642, 645 (Ky. 1992) (quoting *United Carbon Co. v. Ramsey*, 350 S.W.2d 454, 456 (1961)). The Kentucky Supreme Court has "recognized that 'economic and reputational injuries are generally not irreparable.'" *Caudill v. Sanitation Dist. No. 1 of N. Kentucky*, No. 2025-SC-0374-I, 2026 WL 490948, at *13 (Ky. Feb. 19, 2026) (Keller, J., dissenting) (quoting *Norsworthy*, 330 S.W.3d at 62). "An injunction will not be granted on the ground merely of an anticipated danger or an apprehension of it, but there must be a reasonable probability that injury will be done if no injunction is granted." *Norsworthy*, 330 S.W.3d at 63 (internal quotation marks and citation omitted).

Abode states the Court "may infer irreparable harm from breach of a restrictive covenant." ECF No. 2-1 at 13. Abode presents no evidence, nor suggests any such evidence exists, demonstrating a reasonable probability of injury incapable of remedy through compensatory or other corrective relief. Abode asserts "an injunction is the only thing preventing Breuss and Sacred Encounter from unfairly capitalizing off Abode's confidential information and customer base to bypass the expensive and time-consuming processes of generating customer relationships." *Id.* at 14. Nowhere does Abode indicate what the nature of the confidential information is or how it could be used to harm Abode in a manner which cannot be later remedied by compensatory or other corrective relief. As for a customer base, the customer base of a hospice business is not secret or confidential. Given the nature of the hospice business and hospice customers, Abode fails to explain how information from, at latest August 2025, could cause irreparable harm at present beyond that which is compensable by money damages.

Abode fails to identify or detail any confidential information which Breuss's breach of contract risks exposing. This is distinguishable from situations involving non-competition

12

covenants involving specifically identified trade secrets. *Cf. Reg Seneca, LLC v. Harden*, 938 F. Supp. 2d 852, 860 (S.D. Iowa 2013). As such, Abode's reliance on *Reg Seneca* to demonstrate irreparable harm is misplaced. In *Reg Seneca* "a real threat of inevitable disclosure" existed where the "[plaintiff] was involved in a long series of trial-and-error experiments in order to develop the technology it uses today" and the former employee's "new employer ha[d] a biodiesel plant that was constructed very similarly to [plaintiff]'s plant before the upgrades that brought [plaintiff]'s plant up to full capacity." *Id.* Absent an injunction, the former employee's "new employer [would] essentially skip much of the expensive, time-intensive, research process [plaintiff] has already engaged in." *Id.* Utilization of specifically identified trade secrets to avoid the need for independent research and development is far from what Abode suggests here.

Abode fails to indicate there is any evidence of specific confidential information which, if used, could constitute irreparable harm and there is no assertion of any threatened disclosure of trade secrets or a cause of action asserted in the complaint regarding trade secrets. *Cf. id.* at 861. Abode further fails to cite any Kentucky authority which suggests the normal rule—that speculative economic harms compensable by money damages are insufficient to obtain a preliminary injunction—is supplanted by conclusory allegations of harm unrelated to any specific trade secrets.

All the harms Abode alleges are likely to occur are fundamentally monetary in nature and all evidence Abode suggests supports its claims emphasize harms which can be compensated for with monetary relief. Tierney's declaration demonstrates two harms Abode is, and could continue to, suffer. Tierney Decl. ¶¶ 32–36, ECF No. 2-2. The first relates to staff—the need to pay "salaries that it would not otherwise offer in order to attract qualified candidates" and the risk of losing current staff members to Sacred Encounter. *Id.* ¶ 32. Both of these are compensable by money damages as Abode knows both the extent to which salaries have increased over an expected baseline, and the salaries needed to retain talent and replace the talent lost to a new competitor. As

a national firm, Abode is also aware of its salary growth in other comparable markets and can compare that to the salary growth in Des Moines to more precisely measure the impact of new competition in the Des Moines market. While Abode may have to expend additional resources "in terms of money, time and energy" in retaining existing employees and hiring new employees, such injuries "are not enough" to demonstrate irreparable harm. *Norsworthy*, 330 S.W.3d at 62 (internal quotation marks and citation omitted).

The second harm is the loss of customers to a new competitor. Tierney Decl. ¶¶ 34–36, ECF No. 2-2. Tierney states "[t]he competition for hospice patients is intense in the Des Moines area. Having an additional competitor in that market makes it more difficult for Abode to attract new patients." *Id.* ¶ 34. Loss of revenue is a quintessentially monetary harm for which there exists a "pecuniary standard for the measurement of the damages." *Cyprus Mountain Coal Corp.*, 828 S.W.2d at 645. Lost revenue can be compensated for through monetary damages. Abode is aware of the number of patients at Abode facilities before and after the entrant of a new competition and, as a national company, can compare the growth or reduction in patients in the Des Moines area to the growth or reduction in patients at its other facilitates in comparable metro markets where it operates.

Because the two harms Abode asserts will result from Defendnats' violation of the 2021 covenants—the need to pay more to hire and retain employees and lost revenue from loss of patients—are fully compensable through money damages, Abode has failed to demonstrate irreparable harm. Absent a showing of irreparable harm, issuance of a preliminary injunction is strongly disfavored. *Norsworthy*, 330 S.W.3d at 62.

### C.      Balance of Harms

The Court next considers "the balance between th[e] harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). This factor requires examining the

harm granting or denying the injunction poses to all parties to the dispute, as well as other interested parties. *See Dataphase*, 640 F.2d at 113–14; *accord Baker Elec. Coop., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

Abode argues "[w]ithout an injunction, the harm to Abode is clear: Defendants will continue to compete with Abode in the same industry, in the same state, using Abode's confidential information to try to lure Abode's employees away and attract patients who would otherwise have considered Abode. In short, the harm to Abode is to the future of its business." ECF No. 2-1 at 14. Defendants state they would stand to lose the significant investments already put into Sacred Encounter while, "[i]n contrast, Abode's claimed harms are mere speculative losses from ordinary market competition." ECF No. 26 at 19–20.

Abode again cites to the two monetary harms of loss of employees absent an increase in salary and benefits and loss of revenue from patients. Defendants similarly cite to risk of monetary harms. Abode again fails to identify any confidential information at issue—Abode's asserted harm "to the future of its business" flowing from having to raise salaries to retain employees and lost revenue from new competition is a common financial harm stemming from new competition in the market which can be remedied after the parties have had a full opportunity to litigate the claims. ECF No. 2-1 at 14. Because Abode's failure to demonstrate irreparable harm strongly outweighs the relative balance of harms to the parties, the Court need not decisively conclude which anticipated monetary harms would be more severe.

### D.    Public Interest

Finally, the Court considers whether a preliminary injunction would serve the public interest. *Dataphase*, 640 F.2d at 113. Here, the public has only a limited interest in this private dispute between private parties. *See Katecho, Inc. v. Cont'l Mfg. Chemist, Inc*, No. 4:18-cv-00314-RGE-CFB, 2018 WL 9814656, at *9 (S.D. Iowa Oct. 16, 2018); *Reg Seneca, LLC*, 938 F. Supp. 2d at 862.

Defendants argue "[w]ith [Iowa's] aging population and the extraordinarily high cancer rates reported in the State of Iowa, the availability of hospice services in Iowa is a matter of public concern," further adding "[r]estricting a qualified professional from providing hospice care beyond the terms of [an] agreement is a disservice to the public." ECF No. 26 at 21. Because Abode's failure to demonstrate irreparable harm strongly outweighs the limited public interest in this dispute, the Court need not consider the question of whether provision of healthcare heightens such public interest.

## V.    CONCLUSION

Applying the four *Dataphase* factors, the Court finds Abode has failed to demonstrate irreparable harm, weighing strongly against issuing a preliminary injunction. The Court thus denies Abode's motion.

Accordingly, **IT IS ORDERED** that Plaintiff Abode Healthcare Inc.'s Motion for Preliminary Injunction, ECF No. 2, is **DENIED**.

**IT IS SO ORDERED**.

Dated this 22nd day of July, 2026.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE